# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MUTUAL FUNDS | ) | |
| INVESTMENT LITIGATION | ) | MDL Docket No. 1586 |
| (PUTNAM SUBTRACK | ) | Civil Action No. 04-MD-15863 |
| | ) | Honorable J. Frederick Motz |
| *Shahi v. Putnam Investments* | ) | Civil Action No. 04-2605 |

## AMENDED COMPLAINT

NOW COME plaintiffs Kaveh S. Shahi, pro se, and Leslie S. Shahi, represented by Cleary Shahi & Aicher, P.C., and allege as follows in their amended complaint. To the extent not inconsistent with their allegations, plaintiffs refer to and incorporated the Consolidated Second Amended Complaint filed on behalf of the plaintiffs in the Putnam Subtrack in this litigation, and found by this Court to have stated valid causes of action.

1.     Plaintiffs at all relevant times herein were and continue to be residents of the Town of Woodstock, Windsor County, State of Vermont.

2.     At all relevant times Putnam was authorized to engage in business in the State of Vermont. Putnam Investments (Putnam) is located in Boston, Massachusetts, and oversees the management of the Putnam Family of Funds, a complex of mutual funds. As of September 30, 2003, Putnam managed approximately $272 billion. (SEC Order File No.3-11317, November 13, 2003).

3.     Beginning in at least 1998, at least six Putnam employees who worked as investment management professionals engaged in excessive short-term trading of Putnam mutual funds in their personal accounts. Four of those employees engaged in such trading in funds over which they had investment decision-making responsibility and had access to non-public information regarding, among other things, current portfolio holdings, valuations

and transactions not readily available to all fund shareholders. Short-term trading of mutual fund shares can adversely affect mutual fund shareholders because, among other things, it can dilute the value of their shares, raise transaction costs for the fund, disrupt a fund's stated portfolio management strategy, require a fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term performance.  Consequently, mutual fund managers such as Putnam, among other things, often maintain policies and procedures to detect and prevent short-term trading. *Id.*

4.      By at least early 2000, Putnam became aware that several investment management employees were engaging in potentially self-dealing short-term trading of mutual fund shares in their personal accounts. However, Putnam failed to disclose this potentially self-dealing securities trading to the boards of the mutual funds it managed and to the funds' shareholders. Moreover, Putnam also failed to take adequate steps to detect and deter such trading activity through its own internal controls and its supervision of investment management professionals. *Id.*

5.      Justin M. Scott joined Putnam in 1988. Scott was managing director and chief investment officer of the International Equities Group for Putnam.  Omid Kamshad joined Putnam in 1996. During the relevant time period, he served as managing director and chief investment officer of the International Core Equity Group for Putnam. *Id.*

6.      Between 1998 and 2003, Justin M. Scott, managing director and chief investment officer of the International Equities Group, and Omid Kamshad, managing director and chief investment officer of the International Core Equity Group, engaged in

repeated short-term trading of Putnam mutual funds. Both Scott and Kamshad engaged in short-term trading in their personal accounts of mutual funds over which they had investment decision-making responsibility and about which they had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. *Id.*

7.     In addition, four other Putnam employees also engaged in excessive short-term trading of Putnam funds in their personal accounts. Two of these employees, like Scott and Kamshad, traded in funds over which they had investment decision-making responsibility and access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. In total, between 1998 and 2003, short-term trading by these six employees generated more than $1 million in gross personal gains.  *Id.*

8.     Until 2000, these employees' short-term trading went unchecked by Putnam altogether, which had minimal controls in place to detect and deter such trading. Even after Putnam imposed some controls on employee trading in 2001, Kamshad continued to make short-term exchanges without being warned, let alone stopped, by Putnam. *Id.*

9.     Putnam has known since at least 2000 that certain of its investment professionals were engaging in short-term trading of Putnam funds in their personal accounts. Yet, until on or about October 24, 2003, Putnam failed to disclose these potentially self-dealing transactions to fund boards and to fund shareholders. *Id.*

10.     On or about October 24, 2003, Putnam issued a press release disclosing the employee trading for the first time. That release stated that Putnam was aware of:

[s]hort-term trading activity by a small number of our own employees which we had detected in 2000. Some of this activity appears to have been market timing. In some cases, the activity involved investment professionals trading in funds under their supervision . . . .

*Id.*

11.     Kamshad was chief investment officer for international equity at Putnam since early 2002. During the relevant time period, he was a portfolio manager for at least seven mutual funds whose portfolios contained international securities. By virtue of his position at Putnam, Kamshad had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. *Id.*

12.     Between 1998 and 2003, Kamshad engaged in at least 38 "round trip" trades of Putnam funds, including at least four funds he participated in managing.  In these "round trip" trades, Kamshad sold shares an average of only 13 trading days after purchasing shares in a fund and often sold shares only three or fewer trading days after purchases. As a result of his short-term trading, Kamshad realized hundreds of thousands of dollars in gains. Kamshad typically traded hundreds of thousands of dollars worth of fund shares, and on at least one occasion, the value of his short-term trade exceeded $1 million. *Id.*

13.     In January 2000, senior Putnam executives learned of "large and frequent movement" of Putnam funds by Kamshad, who at the time served as lead portfolio manager on Putnam's International Equity and Europe Equity funds. At that time, Kamshad's trading came to the attention of senior managers in Putnam's retirement plan group. On January 25, 2000, the director of Putnam's employee relations and staffing unit discussed with Kamshad his frequent trading, and Kamshad said he would cease that type and level of activity. On

February 18, 2000, the director issued a memorandum to the file confirming this conversation. *Id.*

14.     Following this discussion, Kamshad continued to engage in short-term trading in Putnam funds. Between February and April 2000, Kamshad made at least nine more round trip trades. *Id.*

15.     Subsequently, in mid-2000, a senior executive at Putnam held a meeting with investment professionals in which he stated that Putnam employees must not engage in short-term trading in Putnam funds and told them that their trading must be beyond reproach. Kamshad, like other Putnam portfolio managers, attended this meeting. *Id.*

16.     Despite the admonitions at that meeting, Kamshad again continued to engage in short-term trading. Between August 2000 and September 2000, he made seven more round trip trades. As of March 2003, Kamshad had purchased more than $850,000 worth of shares in Europe Equity, a fund on which he was the lead manager. Four trading days later, he sold Europe Equity shares, garnering a profit of more than $79,000. In total, Kamshad engaged in at least 20 short-term round trip trades after he was warned about his conduct. *Id.*

17.     Scott was chief investment officer of the international equities group at Putnam. During the relevant time period, he was a portfolio manager for at least five mutual funds whose portfolios contained international securities. By virtue of his position at Putnam, Scott had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. *Id.*

18.     Between 1998 and 2000, Scott engaged in approximately 35 round trip trades in Putnam funds, including funds he participated in managing. In 2000 alone, Scott engaged in at least 12 trades in which he bought and sold mutual fund shares on consecutive days. As a result of his short-term trading, Scott realized hundreds of thousands of dollars in gains. Scott often traded millions of dollars worth of mutual fund shares. *Id.*

19.     On February 18, 2000, Scott, a superior to Kamshad, was copied on a memorandum regarding Kamshad's short-term trading. The memorandum, which addresses the warning given to Kamshad in January 2000, makes clear that short-term trading in large amounts was "inconsistent with our tolerances for standard mutual fund clients." Indeed, as of March 2000, Putnam's Intranet advised employees, among other things, that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's funds have had a detrimental effect on the long-term shareholders of those funds." *Id.*

20.     Nonetheless, Scott continued to engage in short term trades. Between March and May of 2000, Scott made more than 20 round trip trades, including 10 "next day" round trip trades in Putnam funds. *Id.*

21.     Other Putnam employees also engaged in improper market timing and other short-term trading of Putnam funds in their personal accounts. Between 2000 and 2001, a Putnam analyst and member of portfolio management teams of international funds, made approximately 49 round trip trades of Putnam mutual funds, including funds for which he had some responsibility. During the period 2000 to 2002, an international fund portfolio manager made approximately 45 round trip trades of Putnam mutual funds, including at least one fund in which she participated in managing. During the period 2000 to 2003, a

co-manager of certain Putnam funds made approximately 36 round trips of Putnam mutual funds, although none appear to have been in funds he managed. Finally, in 2000, an equities analyst made approximately 48 round trip trades of Putnam mutual funds. *Id.*

22.     Although Putnam has engaged in some efforts to detect and deter short term trading in its complex of funds, these efforts failed to prevent its own employees from engaging in short-term trading in Putnam funds. *Id.*

23.     In 1999, Putnam set up a staff of market timing analysts responsible for monitoring and preventing short-term trading activity at Putnam. This department, colloquially referred to as the "market timing police," was typically staffed by two or three analysts. The market timing police relied on several "screens" that were intended to analyze trading activity and alert Putnam to possible market timing activity. *Id.*

24.     Until 2000, however, there were minimal controls against short-term trading by Putnam's own employees in their Putnam retirement or compensation plans. In particular, there were little or no direct controls dedicated to preventing market timing by investment professionals in funds over which they had management responsibility. Even after 2000, Putnam's system for detecting and preventing market timing by its own employees was fundamentally flawed because it only monitored for market timing during one quarter of a given year, leaving more than nine months of every calendar year without any monitoring whatsoever. *Id.*

25.     In early 2000, Kamshad's trading came to the attention of the market timing police, who then relayed it to the Putnam group that oversees Putnam's own retirement and compensation plans. Until October 2003, however, no disciplinary action was taken against

any employee for engaging in market timing or other short-term trading. Until October 2003, Putnam and its portfolio managers did not inform fund boards or fund shareholders of the improper employee trading.

26.     Instead, Putnam attempted to address the problem in mid-2000 by holding a meeting of high-level staff, in which senior investment professionals were told not to engage in excessive short-term trading. *Id.*

27.     In 2001, Putnam implemented a control designed to detect and curb fund timing by all Putnam employees. Beginning in 2001, Putnam conducted an annual review of employee trading frequency. However, the review process focused only on one fiscal quarter's worth of trades in Putnam's 401(k) and compensation plans each year. By design, the review could not capture market timing by an employee unless the trading occurred during the one quarter that was selected. Moreover, trading would be examined only if Putnam detected at least eight trades in the quarter. No special scrutiny was given to portfolio managers or other investment professionals. *Id.*

28.     If market timing was detected, the employee was issued written warnings stating that the employee risked losing their exchange privileges in the future if the trading activity did not stop. Even for employees who received warning letters, however, Putnam failed to review trading activity again for one year. *Id.*

29.     In April 2002, two years after first learning of market timing by investment professionals in funds they helped manage, Putnam amended its Code of Ethics to include a prohibition on employee market timing of Putnam funds. At no time, even after amending

its Code of Ethics, did Putnam disclose the employee market timing to fund boards or to fund shareholders, until the October 2003 press release described above. *Id.*

30.     On or about March 23, 2000, plaintiffs opened mutual fund accounts with the defendant for the purpose of investing for their children's college funds. Plaintiffs' Putnam investments included (but not limited to) its International Equities. Defendant promoted itself as a sound and prudent mutual fund manager. Plaintiffs relied on Putnam's promotion and reputation as well as it prospectuses.

31.     In November 2003, plaintiffs learned through media reports as well as a letter from defendant that it was the subject of investigations by the Securities and Exchange Commission (SEC) and the Massachusetts Securities Division for activities including market timing. The illegal and improper activities at Putnam Investments took place in part during the time frame when plaintiffs opened their accounts with Putnam Investments. Plaintiffs were unaware of such activities at the time they opened their accounts, and Putnam Investments had not then publicly revealed the nature and extent of such activities. Had Putnam Investments disclosed the nature of such activities, plaintiffs would not have purchased securities from Putnam Investments.

32.     In an Order dated November 13, 2003, the Securities and Exchange Commission (SEC) found that Putnam had acted illegally as follows:

       (a)     Putnam willfully violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 in that it, while acting as an investment adviser, employed devices, schemes, or artifices to defraud clients or prospective clients; and engaged in transactions,

practices, or courses of business which operated or would operate as a fraud or deceit upon clients or prospective clients. Specifically, Putnam knowingly, recklessly, and/or negligently failed to disclose to the boards of mutual funds it managed that certain investment management professionals were engaging in potentially self-dealing short-term securities trading. Accordingly, Putnam willfully violated Sections 206(1) and 206(2) of the Advisers Act.

(b)     As a result of the conduct described above, Putnam willfully violated Section 204A of the Advisers Act in that it, while acting as an investment adviser, failed to establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of such investment adviser's business, to prevent the misuse of material, nonpublic information by such investment adviser or any person associated with such investment adviser. Putnam failed to take adequate steps to detect and deter short-term trading of Putnam funds by its portfolio managers and other investment professionals who had access to non-public information regarding, among other things, current portfolio holdings, valuations and transactions not readily available to all fund shareholders. Accordingly, Putnam willfully violated Section 204A of the Advisers Act.

(c)     Rule 17j-l(c), promulgated under Section 17(j) of the Investment Company Act, requires every registered investment company, and its investment adviser, to, among other things, use reasonable diligence and institute procedures reasonably necessary to prevent violations of their code of ethics. After prohibiting market timing in its code of ethics in 2002, Putnam failed to use reasonable controls to monitor and detect such activity by its employees. Accordingly, Putnam willfully violated Section 17(j) of the Investment Company Act and Rule 17j-1(c) thereunder.

(d)     As a result of the conduct described above, Putnam failed reasonably to supervise certain employees, including Scott and Kamshad, who were persons subject to Putnam's supervision, with a view to preventing their violations of Sections 206(1) and 206(2) of the Advisers Act. Putnam failed to adopt and implement procedures reasonably designed to detect or prevent the violations of Scott, Kamshad and other employees. Accordingly, Putnam failed reasonably to supervise within the meaning of Section 203(e)(6) of the Advisers Act.

33.     Putnam consented to the SEC order dated November 13, 2003, and thereby is deemed to have agreed with the SEC's findings as alleged above.

## COUNT I
## (Rescission Pursuant to State Statute for Omission of Material Facts)

34.    Plaintiffs incorporate and reallege paragraphs 1-33.

35.    Defendant is liable for violation of 9 V.S.A §4224a(a)(2) which provides:

  (a)    In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person may not, directly or indirectly:

  .    .    .

  (2) make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;

  .    .    .

36.    Putnam failed to disclose the following material facts to the plaintiffs before their investment on March 23, 2000:

  a.    it had permitted and tolerated market-timed transactions;

  b.    the market timing transactions could not be controlled.  (590 F.Supp.2d at 749-50);

  c.    that illegal conduct had taken place, *namely*, willful violation of Sections 203(e)(6), 206(1), 206(2) and 204(A) of the Investment Advisers Act of 1940;

  d.    that illegal conduct had taken place, *namely*, willful violation of Section 17(j) of the Investment Company Act and Rule 17j-1(c) thereunder;

e.   self-dealing short-term trading of mutual fund shares by several investment management employees in their personal accounts;

f.   large and frequent improper movement of Putnam funds by the lead portfolio manager on Putnam's International Equity and Europe Equity funds;

g.   Putnam's advice to its employees that "[e]xcessive exchanges by a relatively small number of individuals among a number of Putnam's funds have had a detrimental effect on the long-term shareholders of those funds."

h.   Putnam had failed to stop short term trades that took place after such advice;

i.   there were little or no direct controls dedicated to preventing market timing by investment professionals in funds over which they had management responsibility;

j.   Putnam's system for detecting and preventing market timing by its own employees was fundamentally flawed because it only monitored for market timing during one quarter of a given year, leaving more than nine months of every calendar year without any monitoring whatsoever;

k.   no disciplinary action was taken against any employee for engaging in market timing or other short-term trading; and

l.      a scheme whereby the appearance of some controls at Putnam was

given in order to deceive and mislead regulators and investors from

discovering the self-dealing, corruption and favoritism that was

taking place inside Putnam.

37.     The "[l]anguage in the . . . Putnam prospectuses reflected that market

timing trades, because they were injurious to long-term investors, were not permitted in

the funds at the very time that . . . insiders were engaged in market timing." 590

F.Supp.2d at 747. The Putnam prospectuses stated in part under the section "How do I

exchange fund shares?":

> The exchange privilege is not intended as a vehicle for short-term trading.
> Excessive exchange activity may interfere with portfolio management and
> have an adverse effect on all shareholders. In order to limit excessive
> exchange activity and otherwise to promote the best interests of the fund,
> the fund reserves the right to revise or terminate the exchange privilege,
> limit the amount or number of exchanges or reject any exchange. The fund
> into which you would like to exchange may also reject your exchange.
> These actions may apply to all shareholders or only to those shareholders
> whose exchanges Putnam Management determines are likely to have a
> negative effect on the fund or other Putnam funds. Consult Putnam
> Investor services before requesting an exchange.

*Id.* 753-754.

38.     The language in the Putnam prospectus was misleading when coupled with

the omissions because it "failed to cure-in fact, exacerbated-the underlying wrong:

manipulative and deceptive conduct in facilitating, while not disclosing, widespread ...

market timing in the funds." *Id* at 747. Further, Putnam's promotion of itself as a

reputable mutual fund with integrity and honesty was misleading with the omissions alleged herein.

39.     Section 4224a(a)(2) does not require reliance.  Nonetheless, plaintiffs relied on "[t]he integrity of the fund managers and the reasonable assumption that the managers were not breaching their fiduciary duty by permitting the value of their shares to be diluted by improper transactions." 590 F.Supp.2d at 747. Had plaintiffs been advised by Putnam of any of the facts alleged in paragraph 36, *infra,* they would not have purchased Putnam funds.  The omissions by Putnam were not open to plaintiffs and could not have been ascertained through the exercise of reasonable care.

40.     Section 4224a(a)(2) does not require causation.  Nonetheless, it is undisputed "[t]hat Putnam knew rampant market timing was occurring in its funds and that this market timing could be, and was, harmful." *Id.* 757.  Putnam did "[n]ot deny (as is generally recognized in the mutual fund industry and as defendants' regulatory settlements attest) that market timing does cause loss to long-term mutual fund investors." *Id.* 748.  Plaintiffs would not have purchased Putnam funds had they been aware of Putnam's omissions.

41.     Section 4224a(a)(2) applies to omissions of material facts, and does not require that such conduct be fraudulent or deceitful; as such it is not subject to the pleading requirement of Fed.R.Civ.P. Rule 9.  (384 F.Supp.2d 845, 855).

42.     Plaintiffs' remedy is set forth under section 4240(a) which consistent with

the remedy of rescission provides in relevant part:

> (a)     Any person who offers or sells a security in violation of sections 4205, 4213, 4224a or 4234 of this title, or any rule of the commissioner relating to those sections is liable to the person purchasing the security from that person. *The purchaser of the security may sue to recover the consideration paid for the security, together with interest at the legal rate from the date of payment, costs and reasonable attorneys' fees* less the amount of any income received on the security, upon the tender of the security, or for damages plus costs and reasonable attorneys' fees if the purchaser no longer owns the security. Damages are the amount that would be recoverable upon a tender less the value of the security when the purchaser disposed of it and interest at the legal rate from the date of disposition. Tender shall require only notice of willingness to exchange the security for the amount specified.

Emphasis added.

43.     On December 22, 2003, defendant declined the tender of the securities

purchased by plaintiffs.  Plaintiffs have not sold their Putnam shares.  Pursuant to 9

V.S.A. §4240(a), defendant is liable for the consideration paid by plaintiffs together with

interest at the legal rate under Vermont law from the date of payment, costs and

reasonable attorneys' fees.

44.     Putnam made a judicial admission of liability in this litigation as it did not

contest at summary judgment "[t]he merits of a Rule 10b–5 action based on the employee

market timing." 590 F.Supp.2d at 755.  To the extent Rule 10b-5 has language similar to

section 4240(a), Putnam is bound by its admission and is therefore liable for rescission as

alleged.

45.     Any regulatory settlement by Putnam did not result in any payments to the

plaintiffs.  Moreover, plaintiffs seek rescission in this count, not damages, and as such

any regulatory settlement by Putnam is not relevant to plaintiffs' claim.

## COUNT II
### (Rescission Pursuant to State Statute for Fraud and/or Deceit)

46.     Plaintiffs incorporate and reallege paragraphs 1-45.

47.     Defendant is liable for violation of 9 V.S.A §4224a(a)(1) and (3) which

provide:

> (a)     In connection with the offer to sell, sale, offer to purchase or
> purchase of a security, a person may not, directly or indirectly:
>
> (1) employ a device, scheme, or artifice to defraud;
>
> .     .     .
>
> or
> (3) engage in an act, practice, or course of business that operates or
> would operate as a fraud or deceit upon a person.

48.     The omissions alleged above in paragraphs 36-37 were made to the

plaintiffs in Putnam's prospectuses on or about March 23, 2000.  By February 18, 2000,

Putnam was aware of the facts alleged in paragraphs 36-37 including but not limited to

the fact that harmful market timing trading was taking place by its employees and Putnam

was not taking proper steps to control it.  Putnam did not disclose such facts to the

plaintiffs at the time of their purchase on March 23, 2000.  "Market timing then becomes

a 'scheme or artifice to defraud' or, at least, 'a practice ... or course of business which

operates as a fraud or deceit' upon those who have been misled or lulled into purchasing

mutual fund shares in ignorance of its occurrence." (384 F.Supp.2d at 856-57).

49.     Plaintiffs relied on Putnam's omissions to their detriment by purchase of

the funds.  Had plaintiffs known the truth, they would not have bought the Putnam funds.

Accordingly, plaintiffs seek the relief of rescission and award of interest at the legal rate

pursuant to 9 V.S.A. §4240(a).

## COUNT III
### (Rescission Under Vermont Law)

50.     Plaintiffs incorporate and reallege paragraphs 1-49.

51.     Defendant's material omissions of fact were misleading and constitute

grounds for rescission under Vermont common law.  Vermont law does not require a

showing of fraud to support a claim for rescission.  *Union Bank v. Jones,* 138 Vt. 115,

121, 411 A.2d 1338, 1342 (1980).

## COUNT IV
### (Securities Exchange Act of 1934)

52.     Plaintiffs incorporate and reallege paragraphs 1-51.

53.     Defendant's omissions constitute violations of the Securities Exchange

Act of 1934, section 10(b) as amended,15 U.S.C. § 78j, and Rule 10b–5 promulgated

pursuant to the Act, 17 C.F.R. § 240.10b–5. Rule 10b-5 states that it is unlawful, directly

or indirectly:

(a)   To employ any device, scheme, or artifice to defraud,

(b)   To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)   To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

54.   The omissions alleged above in paragraphs 36-37 were made to the plaintiffs in Putnam's prospectuses on or about March 23, 2000. The omissions were of material facts which were necessary to make the statement alleged in paragraph 37, *infra*, contained in the prospectuses not misleading. By February 18, 2000, Putnam was aware of the facts alleged in paragraphs 36-37 including but not limited to the fact that harmful market timing trading was taking place by its employees and Putnam was not taking proper steps to control it. Putnam did not disclose such facts to the plaintiffs at the time of their purchase on March 23, 2000. As such Putnam acted knowingly by failing to disclose material facts

55.   "Market timing then becomes a 'scheme or artifice to defraud' or, at least, 'a practice ... or course of business which operates as a fraud or deceit' upon those who have been misled or lulled into purchasing mutual fund shares in ignorance of its occurrence." (384 F.Supp.2d at 856-57).

56.   The Supreme Court has held that in omissions cases "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in

the making of this decision." (384 F.Supp.2d at 863, citing *Affiliated Ute Citizens v. United States,* 406 U.S. at 153-154, 92 S.Ct. 1456).  "Self-evidently, a person selecting a mutual fund in which to purchase and hold shares might have considered it important to know whether (and to what extent) favored investors were being allowed to late trade and market time in the fund in light of the fact that toleration of the practice could increase fund expenses and have a substantial effect upon future fund performance." *Id.* Plaintiffs "[w]ere relying upon the integrity of the fund managers and the reasonable assumption that the managers were not breaching their fiduciary duty by permitting the value of their shares to be diluted by improper transactions." (590 F.Supp.2d at 747).  Plaintiffs would not have purchased the Putnam funds had Putnam disclosed the true facts.

57.    Plaintiffs "[w]ere harmed as a result of defendants' fraudulent scheme and course of business which diminished the value of their shares by, inter alia, siphoning off from the funds profits to which shareholders were entitled, substantially increasing transaction expenses and fees, requiring sales of securities held by the fund in a falling market (sometimes with adverse tax consequences), and also requiring the fund to hold an excessive amount of cash to redeem shares in market timed trades." (384 F.Supp.2d at 864).

58.    Any regulatory settlement by Putnam did not result in any payments to the plaintiffs.  Plaintiffs are entitled to damages, compensatory and punitive, to the maximum extent allowed by law, together with attorneys' fees and costs.

<u>COUNT V</u>

<u>(Rescission Pursuant to Securities Act of 1933)</u>

59.     Plaintiff reallege and incorporate allegations in paragraphs 1-58

60.     Defendant's material omissions of facts in its prospectuses as alleged in

paragraphs 36-37, *infra,* was a violation of section 12(2) of the Securities Act of 1933, 15

U.S.C. §77l, which provides in relevant part:

> Any person who--
>
> .       .       .
>
> (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b) of this section, to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

61.     Section 77l creates per se liability for violation of the Act. *Byrnes v.*

*Faulkner, Dawkins & Sullivan,* 413 F.Supp. 453 (S.D.N.Y. 1976) *affirmed* 550 F.2d

Cleary Shahi & Aicher
P.O. Box 6740
Rutland, VT 05702-6740

(802) 775-8800

21

1303.   The elements of scienter and loss causation are not required.  *Polycast Technology Corp. v. Uniroyal, Inc.,* 792 F.Supp 224 (S.D.N.Y. 1992).

62.     Plaintiffs have not sold their Putnam shares which they purchased in Marcy 2000 by means of prospectuses that violated section 77l.  Plaintiffs in the exercise of reasonable care could not have known of such untruth or omissions in Putnam's prospectuses,  are therefore entitled to rescission with interest thereon.

WHEREFORE, plaintiffs seek judgment against defendant for rescission, interest at legal rate of 12% under Vermont law, an award of  compensatory damages, statutory damages, punitive damages, interest, costs and such further relief as may be appropriate.

### DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury.

Dated this 9th day of September, 2013.

_____
Kaveh S. Shahi, pro se, and as
attorney for Leslie S. Shahi

Cleary Shahi & Aicher
P.O. Box 6740
Rutland, VT 05702-6740

(802) 775-8800